DeAnne Casperson, Esq. (ISB No. 6698)
dcasperson@holdenlegal.com
Amanda E. Ulrich, Esq. (ISB No. 7986)
aulrich@holdenlegal.com
HOLDEN, KIDWELL, HAHN & CRAPO, P.L.L.C.
P.O. Box 50130
1000 Riverwalk Drive, Suite 200
Idaho Falls, ID 83405
Telephone: (208) 523-0620
Facsimile: (208) 523-9518

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JASON LENZ,<br><br>                Plaintiff,<br><br>v.<br><br>BATTELLE ENERGY ALLIANCE, LLC,<br>a Delaware limited liability company,<br><br>                Defendant. | Case No.<br><br>**COMPLAINT AND DEMAND FOR<br>JURY TRIAL**<br><br>Filing Fee $400.00 |

Plaintiff, Jason Lenz, by and through his counsel of record, Holden, Kidwell, Hahn & Crapo, P.L.L.C. and as a cause of action against Defendant Battelle Energy Alliance, LLC, alleges and complains as follows:

**JURISDICTION AND VENUE**

1.     This is an action brought under the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12101, *et seq.*; the Idaho Human Rights Act, Idaho Code § 67-5901, *et seq.*; and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*

2.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 1332, 1343, and 1367.

3.      Venue in this action properly lies in the United States District Court for the District of Idaho, Eastern Division, pursuant to 28 U.S.C. § 1391(b) because the claims arose, in this judicial district; and venue also properly lies in this district pursuant to 42 U.S.C. § 12117 and 29 U.S.C. § 2617 because the unlawful employment practices were committed in this judicial district.

## PARTIES

4.      Plaintiff Jason Lenz ("Plaintiff") is a male citizen and resident of the United States of America, who resides in Rigby, Idaho.

5.      Defendant Battelle Energy Alliance, LLC ("Defendant" or "BEA") is a Delaware limited liability company with its principal place of business located in Idaho Falls, Idaho.  BEA operates the Idaho National Laboratory ("INL"), near Idaho Falls, Idaho, under contract with the U.S. Department of Energy.

6.      At all times material to this Complaint, BEA regularly employed fifty or more persons, and was engaged in an industry affecting commerce, bringing Defendant within the ambit of Idaho Code §§ 18-7301, and 67-5901, *et seq.,* 42 U.S.C. § 12101, *et seq.*, and 29 U.S.C. § 2601, *et seq*.

## FACTS COMMON TO ALL COUNTS

7.      Plaintiff realleges and incorporates by reference paragraphs 1 through 6 as though fully set forth herein.

8.      Plaintiff suffers from multiple medical conditions including Post Traumatic Stress Disorder ("PTSD"), General Anxiety Disorder, Major Depressive Disorder, and Sleep Apnea.

9.      Plaintiff began working for BEA on or about July 29, 2013.  Plaintiff was hired as a Life Safety Systems Technician, specifically worked as a Fire Protection Technician, and was assigned to work at the Central Facilities Area ("CFA") at the INL.

10.     When he began working for BEA, Plaintiff's manager was Raimee F. Lim ("Lim"), who was in turn supervised by Steve Winn ("Winn").

11.     Plaintiff discussed his disabilities with Lim in October 2013, which required occasional absences.

12.     On or about January 7, 2014, Plaintiff received a positive performance review from Lim, showing that Plaintiff was effective or better in all rated performance areas.

13.     During the week of January 26, 2014, Plaintiff met with Lim and Winn.  During the meeting, Winn made Plaintiff apologize to Lim for Winn having to make sure she was being a manager and not being soft on her employees.  Winn also told Plaintiff "if we had known you had these problems we would not have hired you."

14.     Winn informed Plaintiff he was required to call in before 7:00 a.m. if he was going to be absent that day. Winn threatened Plaintiff that if he didn't follow the pre-7:00 a.m. policy, he would fire Plaintiff. Winn implemented this policy even though Plaintiff was aware of other employees who were permitted to call in at 8:00 a.m or later.

15.     At this meeting, Lim also suggested that Plaintiff contact the Employee Assistance Program ("EAP") to begin the interactive accommodation process.

16.     The next week, Plaintiff began working with BEA's EAP and the HR department to establish reasonable accommodations for his disabilities.

17.     On or about March 6, 2014, Plaintiff met with Lim, Kristine Staten ("Staten"), BEA's HR leave administrator, and Wendy Kotter ("Kotter"), an HR representative, to discuss what

reasonable accommodations could be made for Plaintiff's disabilities.  Plaintiff expressed his reservations about Winn's ability to accept any reasonable accommodations made for Plaintiff by Lim and HR.  After discussing various proposed reasonable accommodations, Plaintiff, Lim, Staten, and Kotter agreed to a specific set of accommodations, and agreed that Lim would outline them in writing.

18.   The accommodations were set forth in an Interoffice Memorandum from Lim to Plaintiff, dated March 13, 2014, with the subject line of "Life Safety Systems Management Expectations," which included the following among other things:

   a.   In addition to a 30-minute unpaid lunch and two 15-minute breaks, Plaintiff was allowed to take "more frequent shorter breaks" as long as they did not "impact critical testing procedures."

   b.   Absences were required to be reported in advance, if possible.  Otherwise, Plaintiff was directed to "call [Lim] before your shift begins."

   c.   Plaintiff was informed that he could make up any missed time with "Flex Time" (hours outside his ordinary shift during the same week), provided that appropriate work  activities and supervision were available.

   d.   Plaintiff was allowed to wear noise-cancelling headphones at his work station.

   e.   Plaintiff's cubical was relocated to a low-traffic area to minimize distractions, noise, and stressors and to be closer to his senior technician mentor.

19.   On March 19, 2014, Lim issued Plaintiff a documented verbal warning for calling in an absence after 7:00 a.m., but before that day's Plan of the Day meeting at 8:00 a.m.  Lim mentioned that the warning would not be in Plaintiff's HR file, would only be kept in Lim's office, and would be removed at a later time.

20.   After going over the documentation of the verbal warning, Plaintiff and Lim went to Staten and Kotter so Plaintiff could explain that his medications make it especially difficult to wake up in the morning.   In light of this information, everyone agreed to the following clarifications to the accommodations:

   a.   Plaintiff's wife could call Lim in those situations where Plaintiff could not wake up to call her.

   b.   Allowing Plaintiff to text management the night he takes medication that could cause him to oversleep the next day;

   c.   Plaintiff and Lim would work together to communicate more clearly and to identify opportunities for Flex Time during any week that Plaintiff could not work part of his normal shift.

   d.   To help facilitate communication, Plaintiff and Lim agreed to meet one-on-one at least once a week.

21.   In addition to meeting weekly with Lim, Plaintiff began about this time to attend EAP counseling sessions Dan Weinrich ("Weinrich").

22.   In early May 2014, Lim resigned from her position with BEA.  While BEA searched for a replacement for Lim, Winn took over her direct supervisory responsibilities of Plaintiff.

23.   Shortly after Lim's resignation, Winn informed Plaintiff that he was watching Plaintiff and that Winn had assigned two employee to watch Plaintiff and report to Winn on Plaintiff's activities.

24.   Winn engaged in weekly one-on-one meetings with Plaintiff, and viewed them as a disciplinary measure against Plaintiff.   Only after HR intervened in late May 2014, at

Plaintiff's request, did Winn accept that the meetings were an accommodation and were not disciplinary.

25. During the meetings, Winn repeatedly inquired about the exact nature of Plaintiff's disabilities. Plaintiff did not disclose his diagnoses, but told Winn that he had medical conditions that affect his life and his attendance at work.

26. HR confirmed to Plaintiff that he did not have to detail his disabilities to Winn.

27. Nevertheless, Winn persistently tried to find out exactly what Plaintiff's disabilities were. Winn also continued to threaten Plaintiff with termination because of his absences.

28. In June 2014, Plaintiff overheard two of his co-workers discussing him, his medical conditions, and his absences. One of them also mentioned that they thought Plaintiff was the "lone gunman type." Remembering that Winn was having employees watch him, Plaintiff approached them and his co-workers ended their conversation.

29. Plaintiff filed a complaint with Kotter about Winn's activities and his utilization of employees to spy on Plaintiff in search of reasons to fire Plaintiff. Kotter investigated Plaintiff's complaint, but concluded her investigation on July 7, 2014, without finding that Winn had acted inappropriately, despite Winn's repeated inquiries into Plaintiff's medical conditions, punitive treatment of Plaintiff's accommodations, and direction to other employees to spy on Plaintiff.

30. During July 2014, Plaintiff became eligible for and began using Family Medical Leave, pursuant to the FMLA.

31. In the weeks following Kotter's investigation, Winn's adverse actions against Plaintiff intensified.

32.   When Winn saw Plaintiff outside at a picnic table, taking a short break pursuant to the accommodations provided to him, Winn told Plaintiff that he needed to keep busy and that taking a break was an abuse of company time.

33.   Winn continually pressured and harassed Plaintiff to obtain a NICET certification, despite the fact that Plaintiff had a similar IMSA certification and the fact that other technicians, who had worked for BEA for years longer than Plaintiff, did not have a NICET certification.

34.   By August 2014, Winn had initiated an investigation of Plaintiff regarding Plaintiff's internet usage for non-business purposes at work, despite the fact that no one had ever expressed concern over Plaintiff's intermittent non-business use of the internet, and that Plaintiff had been informed by Lim that if he had completed his tasks and had no other work available that he could use the internet.

35.   Plaintiff was informed by the BEA investigator that he had found no wrong doing by Plaintiff.

36.   In mid-August, 2014, Plaintiff reported his concerns about Winn's discriminatory and retaliatory motivation behind the investigation to HR.

37.   On or about September 2, 2014, Winn provided a notice to Plaintiff, informing him that a Personnel Action Advisory Group ("PAAG") had been convened regarding Plaintiff and that Plaintiff was suspended without pay for three days for excessive use of the internet.

38.   After discussing the suspension with Plaintiff, Winn summoned a senior technician, Curt Hein ("Hein"), into the office and read the notice to Hein and explained to Hein how to discipline an employee, in front of Plaintiff, humiliating and demeaning Plaintiff in the process.

39.   During September 2014, Plaintiff stopped going to EAP meetings and communicating with Weinrich because Plaintiff saw a distinct change in Weinrich's approach to the meetings following the investigation.

40.   Due to his disabilities and his medication, Plaintiff was not at his scheduled shift of September 29, 2014.  He notified Winn as required by the accommodation.

41.   On September 30, 2014, when Plaintiff returned to work, Winn cornered Plaintiff in his cubicle and repeatedly asked why Plaintiff had missed work the previous day. Plaintiff replied that it was due to his medical condition.  Winn stared directly into Plaintiff's eyes in an intimidating manner and twice asked if Plaintiff was feeling better.

42.   During October 2014, BEA hired Terri Suniga-Harris ("Suniga-Harris"), a personal friend of Winn, to replace Lim.

43.   During Plaintiff's first meeting with Suniga-Harris, his new manager, Winn became upset and accused Plaintiff of going over Winn's head when Plaintiff, at the direction of a senior technician, inquired of another management-level employee as to whether Plaintiff's IMSA certification was sufficient to render it unnecessary for Plaintiff to obtain a NICET certification.

44.   In or about November 2014, Plaintiff requested a transfer from CFA to a work location in Idaho Falls, as a means of accommodating Plaintiff so he would not be subjected to repeated encounters with Winn. Winn's continued discriminatory and retaliatory actions toward Plaintiff had been causing Plaintiff's disabilities to be further aggravated.

45.   Plaintiff's request for accommodation that his work location be transferred to Idaho Falls was denied.

46.     Plaintiff was informed his request was denied because there was no work available in Idaho Falls. However, two other technicians from CFA were assigned to work in town during the same time period, and Plaintiff learned from another employee that there was an abundance of work available in town which Plaintiff could have performed.

47.     On or about December 8, 2014, Winn conducted Plaintiff's annual review, even though Suniga-Harris was his direct supervisor. Winn gave Plaintiff an overall rating of "Does Not Meet Expectations," lowest ranking possible. Although Suniga-Harris was present, Winn would not permit her to speak or provide comments regarding Plaintiff's performance.

48.     When Plaintiff tried to provide his own feedback regarding Winn's evaluation of his performance, Winn would only intensify his hostility and arguments toward Plaintiff.

49.     At the conclusion of the meeting, Winn collected all hard copies of the annual review, preventing Plaintiff from providing his own written feedback on the annual review.

50.     Subsequent to Plaintiff's annual review meeting with Winn, Plaintiff's disabilities were further aggravated due to Winn's conduct toward Plaintiff, with Winn instigating, among other things, panic attacks in Plaintiff.

51.     Plaintiff submitted a complaint about the review and Winn's conduct to HR, which began an investigation during BEA's annual work curtailment at the end of the year.

52.     On or about January 5, 2015, Plaintiff reported to HR that he did not believe his concerns were adequately addressed and was concerned about returning to work due to medical issues after the curtailment.

53.     On or about January 7, 2015, Plaintiff was notified by BEA that he had exhausted his FMLA leave. Plaintiff received a telephone call from HR that any further time off would not be protected.

54.     On or about January 12, 2015, which was Plaintiff's first day back at work after curtailment, Plaintiff was given a written disciplinary notice for not following proper call in procedure, even though the alleged misconduct had occurred over one month prior.

55.     When Plaintiff was issued the written disciplinary notice, both Suniga-Harris and Winn were present, despite the fact that Winn should not have been present, per company practice of not having upper-level supervisors present when disciplinary action is issued. Again, Winn intimidated Plaintiff.

56.     Plaintiff reported the meeting regarding the disciplinary notice to HR, including Winn's presence at the meeting.

57.     On or about January 15, 2015, BEA suggested that Plaintiff would no longer have to have direct interaction with Winn at work. However, Plaintiff would still have to work in the same close quarters with Winn, and would, by virtue of the work space, have to frequently see Winn at work, use common facilities with Winn, etc.

58.     At this point in time, Plaintiff was having panic attacks and serious mental health concerns even at the thought of having to see Winn at work due to Winn's prior harassing and discriminatory conduct. Consequently, Plaintiff had no choice but to resign for the sake of his health, which his health care provider previously advised him to do.

59.     Plaintiff was constructively discharged form his employment with BEA on or about January 19, 2015.

60.     On or about January 27, 2014, Plaintiff dually filed a Charge of Discrimination with the Idaho Human Rights Commission ("IHRC") and the Equal Employment Opportunity Commission ("EEOC").

61.     Plaintiff received his Notice of Right to Sue from the IHRC on or about August 21, 2015.

62.     Plaintiff has exhausted his administrative remedies.

## COUNT ONE
## VIOLATION OF THE AMERICANS WITH
## DISABILITIES ACT AMENDMENTS ACT
### (Disability Discrimination)

63.     Plaintiff realleges and incorporates by reference paragraphs 1 through 62 as though fully set forth herein.

64.     Plaintiff has multiple disabilities as defined by the ADAAA.

65.     Plaintiff's disabilities are Post Traumatic Stress Disorder ("PTSD"), General Anxiety Disorder, Major Depressive Disorder, and Sleep Apnea.

66.     Plaintiff's disabilities substantially limit Plaintiff's major life activities, including his ability to sleep, wake up, focus, relax, and work.

67.     Plaintiff was a qualified individual under the ADAAA, i.e., an individual who, with or without reasonable accommodation, could perform the essential functions of his job.

68.     BEA took adverse employment action against Plaintiff and discriminated against Plaintiff by, among other things, disciplining Plaintiff up for minor issues, repeatedly harassing Plaintiff about his medical conditions, absences, and certifications, giving Plaintiff a extremely poor annual review, and constructively terminating Plaintiff.

69.     BEA took adverse employment actions against Plaintiff based on his disabilities.

70.     As a direct and proximate result of BEA's actions and/or failure to act, Plaintiff has suffered and will continue to suffer emotional distress consisting of outrage, shock, and humiliation, based upon the discrimination he experienced. Further, Plaintiff has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages, such amount to be proven at trial as well as any other equitable remedies available to him.

71.     BEA's conduct was malicious and oppressive, and done with a reckless disregard for Plaintiff's federally protected rights, for which Plaintiff is entitled to punitive damages pursuant to 42 U.S.C. § 1981(a).

## COUNT TWO
## VIOLATION OF THE IDAHO HUMAN RIGHTS ACT
### (Disability Discrimination)

72.     Plaintiff realleges and incorporates by reference paragraphs 1 through 71 as though fully set forth herein.

73.     BEA violated Idaho Code § 67-5901, *et seq.,* by discriminating against Plaintiff based upon his disabilities.

74.     As a direct and proximate result of BEA's actions and/or failure to act, Plaintiff has suffered and will continue to suffer emotional distress consisting of outrage, shock, and humiliation, based upon the discrimination he experienced. Further, Plaintiff has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to him.

75.     BEA's conduct was malicious and oppressive, and done with a reckless disregard for Plaintiff's rights, for which Plaintiff is entitled to punitive damages pursuant Idaho Code § 67-5908.

## COUNT THREE
## VIOLATION OF THE AMERICANS WITH
## DISABILITIES ACT AMENDMENTS ACT
### (Hostile Work Environment)

76.     Plaintiff realleges and incorporates by reference paragraphs 1 through 75 as though fully set forth herein.

77.     Plaintiff is a qualified individual with disabilities.

78.     Plaintiff was subjected to verbal or physical harassment by BEA because of his disabilities. Such harassment includes, but is not limited, to the following:

    a.      Continuously harassing Plaintiff about redundant certifications that were not being required of other employees with the same job duties;

    b.      Treating weekly meetings with management as a punitive measure rather than an accommodation;

    c.      Having Plaintiff's co-workers spy on Plaintiff;

    d.      Subjecting Plaintiff to an investigation regarding computer usage;

    e.      Repeatedly pressuring Plaintiff to disclose the exact diagnoses of his medical conditions;

    f.      Threatening to terminate Plaintiff's employment;

    g.      Issuing written disciplinary action against Plaintiff;

    h.      Issuing Plaintiff an extremely poor annual review;

    i.      Subjecting Plaintiff to intimidating behavior, such as threatening stares; and

    j.      Ridiculing and humiliating Plaintiff in front of his co-workers and new manager.

76.     BEA's verbal and physical harassment of Plaintiff based upon his disability created a hostile work environment.

77.     BEA's conduct toward Plaintiff was unwelcome.

78.     BEA's conduct was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and to create an abusive, discriminatory and hostile work environment.

79.     Plaintiff perceived the working environment to be abusive, hostile and/or offensive.

80.     A reasonable person in Plaintiff's situation would have perceived the working environment to be abusive, hostile and/or offensive.

81.     Plaintiff sustained several adverse tangible employment actions, including being a formal investigation, without any prior corrective action or direction, being subjected to abusive and harsh treatment, being given disciplinary action, being issue a extremely poor annual review, and being constructively terminated.

82.     As a direct and proximate result of BEA's actions and/or failure to act, Plaintiff has suffered and will continue to suffer emotional distress consisting of outrage, shock, and humiliation, based upon the hostile work environment he experienced. Further, Plaintiff has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages, such amount to be determined at trial, as well as any other equitable remedies available to him.

83.     Defendant's conduct was malicious and oppressive, and done with a reckless disregard for Plaintiff's federally protected rights, for which Plaintiff is entitled to punitive damages pursuant 42 U.S.C. § 1981(a).

## COUNT FOUR
## VIOLATION OF THE IDAHO HUMAN RIGHTS ACT
### (Hostile Work Environment)

84.     Plaintiff realleges and incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

85.     BEA violated the Idaho Human Rights Act, Idaho Code § 67-5901, *et seq.,* by subjecting Plaintiff to a hostile work environment.

86.     As a direct and proximate result of BEA's actions and/or failure to act, Plaintiff has suffered and will continue to suffer emotional distress consisting of outrage, shock, and humiliation,

based upon the hostile work environment he experienced. Further, Plaintiff has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages, such amount to be determined at trial, as well as any other equitable remedies available to him.

87.     Defendant's conduct was malicious and oppressive, and done with a reckless disregard for Plaintiff's rights, for which Plaintiff is entitled to punitive damages pursuant Idaho Code § 67-5908.

**COUNT FIVE**
**VIOLATION OF THE AMERICANS WITH**
**DISABILITIES ACT AMENDMENTS ACT**
**(Retaliation)**

88.     Plaintiff realleges and incorporates by reference paragraphs 1 through 87 as though fully set forth herein.

89.     Plaintiff engaged in an activity protected by federal law by requesting accommodations for his disabilities and objecting to the discrimination and hostile work environment created by Defendant and reporting this conduct to BEA's HR personnel.

90.     Defendant subjected Plaintiff to adverse employment actions in retaliation for requesting accommodations and reporting discrimination, including but not limited to the following actions:

      a.     Increased harassment from Winn about Plaintiff's absences and additional breaks afforded to Plaintiff by the accommodation;

      b.     Changes in the attitude and conduct of the EAP;

      c.     Instigating an investigation of Plaintiff;

      d.     Humiliating Plaintiff in front of co-workers and his new manager;

      e.     Issuing Plaintiff disciplinary actions; and

   f.  Providing an unfair and extremely negative annual review.

91. Such adverse employment actions constitute retaliation against Plaintiff for requesting accommodations and objecting to and reporting discrimination and a hostile work environment created by BEA.

92. As a direct and proximate result of BEA's actions and/or failure to act, Plaintiff has suffered and will continue to suffer emotional distress consisting of outrage, shock, and humiliation, based upon the retaliation he experienced. Further, Plaintiff has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to him.

93. BEA's conduct was malicious and oppressive, and done with a reckless disregard for Plaintiff's federally protected rights, for which Plaintiff is entitled to punitive damages pursuant to 42 U.S.C. § 1981(a).

**COUNT SIX**
**VIOLATION OF THE IDAHO HUMAN RIGHTS ACT**
**(Retaliation)**

94. Plaintiff realleges and incorporates by reference paragraphs 1 through 93 as though fully set forth herein.

95. Plaintiff engaged in an activity protected by Idaho law by requesting accommodations and objecting to the discrimination and hostile work environment created by Defendant and reporting this conduct to Defendant's HR personnel.

96. BEA subjected Plaintiff to adverse employment actions as provided above.

97. Such adverse employment actions constitute retaliation against Plaintiff for objecting to and reporting discrimination and a hostile work environment created by BEA.

98.     As a direct and proximate result of BEA's actions and/or failure to act, Plaintiff has suffered and will continue to suffer emotional distress, consisting of outrage shock and humiliation based upon the retaliation he experienced.  Further, Plaintiff has suffered and will continue to suffer loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to him.

99.     Defendant's conduct was malicious and oppressive, and done with reckless disregard for Plaintiff rights for which Plaintiff in entitled to punitive damages pursuant to Idaho Code § 67-5908.

## COUNT SEVEN
## VIOLATION OF THE FAMILY
## AND MEDICAL LEAVE ACT

100.    Plaintiff realleges and incorporates by reference paragraphs 1 through 99 above as though fully set forth herein.

101.    Plaintiff availed himself of a protected right under the FMLA by qualifying for and taking FMLA leave.

102.    BEA took multiple adverse employment actions against Plaintiff as provided above, including issuing him an extremely poor annual review, and constructively discharging his employment as a result of Plaintiff's requesting and taking intermittent FMLA leave.

103.    BEA interfered with Plaintiff's rights under the FMLA by taking adverse employment actions against Plaintiff as a result of his taking FMLA leave.

104.    The adverse employment actions BEA took against Plaintiff occurred under circumstances raising a reasonable inference or showing direct evidence that BEA took adverse

employment actions against Plaintiff due to his exercise of FMLA rights or to interfere with his FMLA rights.

105.   As a direct and proximate result of BEA's actions and/or failures to act, Plaintiff has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.  Plaintiff is therefore entitled to general and compensatory damages, such amount to be proven at trial, as well as other equitable remedies available to him.

106.   BEA's actions and/or failures to act were in bad faith for which Plaintiff is entitled to liquidated damages pursuant to 29 U.S.C. § 2617(a)(1).

## ATTORNEY'S FEES

107.   As a further direct and proximate result of Defendant's actions and/or failures to act, Plaintiff has been compelled to retain the services of counsel, and has thereby incurred and will continue to incur costs and attorney's fees which should be required to be paid by Defendant pursuant to 29 U.S.C. § 2617(a)(3), 42 U.S.C. § 12205, and Idaho Code § 12-120(3).

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury as to all issues triable to a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

1.   For compensatory and general damages as well as statutorily available damages in an amount as shall be proven at trial;

2.   For any available equitable remedies;

3.   For punitive damages;

4.   For liquidated damages pursuant to 29 U.S.C. § 2617(a)(1);

5.      For attorney's fees pursuant to statute and costs of suit; and

6.      For such other and further relief as the Court deems just and proper.


Dated this 17th day of November, 2015.

                                        _____/s/_____
                                        DeAnne Casperson
                                        Holden, Kidwell, Hahn & Crapo, P.L.L.C.

G:\WPDATA\DC\18522 Lenz\Pleadings\Complaint.wpd:dg